May it please the Court, Elizabeth Dahlstrom on behalf of Petitioner Appellant Raynard Cummings. Your Honors, the California Supreme Court unreasonably denied all four of the claims discussed in Mr. Cummings' opening brief, but today I'd like to focus on just two of those claims. The first is the prosecution's use of the Court's own bailiff as a key witness in violation of Turner v. Louisiana, and the second is the prosecution's use of racial profiling and group bias to exclude black prospective jurors from the veneer in violation of Batson v. Kentucky. Both of these errors represent extreme malfunctions in the criminal justice system, which this Court is empowered to correct even under the ADPA. Turning first to the bailiff claim, this claim is of course subject to 2254D, and Mr. Cummings has raised a number of arguments under D1 and D2 that justify de novo review. But this Court doesn't need to agree with all of those, or even reach all of those. Mr. Cummings only needs to prove one in order to justify de novo review of this claim. And perhaps the simplest and most compelling argument for de novo review is that the State Court unreasonably found that La Casella, the Court's bailiff, was not a key witness within the meeting of Turner. As this Court will recall, La Casella testified that Mr. Cummings fired the first shot at the officer. Now, the State Court found that he wasn't a key witness or a crucial witness, but in this appeal, Respondent has admitted There certainly wasn't the only witness. No, Your Honor, he was not the only witness. In fact, weren't there quite a number of witnesses whose testimony was admitted with respect to the circumstances? Yes, Your Honor. There were other witnesses, but none were as clear and credible as the Court's bailiff, Mr. La Casella. Now, Respondent, again, has admitted that La Casella was an important witness. On page 49 of the answering brief, Respondent says, Obviously, any admission by a defendant to committing a crime is an important piece of evidence. And, Your Honors, we couldn't agree more. And perhaps the reason why the parties are in line on this is that there is no case upholding a bailiff's testimony where the bailiff gave substantive evidence of a defendant's confession, especially in a murder case. If we agree with you that the California Supreme Court erred in that factual determination, and we take the prosecutor's closing argument in which he said it was the most important witness, do we still defer to the California Supreme Court's interpretation as to the circumstances involving that witness at trial? No, Your Honor. Your Honor, once D-1 or D-2 has been satisfied, this Court can review the claim, including all of the other parts of the claim de novo. And as Your Honor mentioned, there was a very long section in closing argument, which the California Supreme Court completely ignored in its opinion. That's the part of the argument where the district attorney said, La Casella is perhaps the most important witness in this case. He told the jury to forget Dr. Kogan and Dr. Herman, forget all of the eyewitnesses, and forget all of the jailhouse informants. He told the jury they could convict on La Casella's testimony alone. But one of the key differences, it seems to me, between this and the Gonzales and Turner cases out of the Supreme Court is that in those cases you had them eating lunch with the jury, running errands. Basically, the bailiff was babysitting the jury in a sequestration situation in one of the cases. And we don't have that here. It's basically the bailiff acting primarily as a security person at the back of the courtroom. Why wouldn't it be reasonable for the California Supreme Court to make the determination that Turner doesn't compel the result that you want? Because, Your Honor, Turner announced a very specific rule that applies in a very unique set of circumstances. It is not, for example, a broad rule on reasonableness, like as in Strickland v. Washington, where the state court has great leeway in applying that rule. This is a very unique rule, and it's fairly narrow. And the import of some of that evidence, the bailiff eating lunch, is that he had contact with the witnesses outside of court. He had an opportunity to develop rapport with them and credibility with them that did not come from the witness stand. Well, compare that with Turner. In Turner, it was a three-day trial, and they were sequestered, and the bailiff there did eat lunch with them and care for them. Here, we have a non-sequestered trial and a much longer duration of time. But the bailiff never ate lunch with the jurors in this case? No, Your Honor. But he had relatively little contact, and so much as the contact was, it was entirely formal. Isn't that the distinction? The main distinction is that some of the contact occurred outside of court, and we do have that here. He said that he had contact with jurors somewhere between 25 and 50 times. He was so frequent and common for him to have contact with jurors that he said he didn't bother to count those occurrences. And those contacts that came outside of court helped him to develop that rapport and that credibility with the jury that no other witness could ever have. Now, I'd like to address another issue raised in the brief, which is that the state court failed to recognize that Turner error is structural. That means that once we have proven that Locasella was a key witness and he had sufficient contact, then a presumption of prejudice attaches. Here, the state court engaged in a balancing test, probativity versus prejudice, for which there is no precedent or no indication in the text of either Turner or Gonzalez for that kind of treatment. What do you make of the California Supreme Court's conclusion that because this was not an occasion in which his testimony was foreseeable, that that provides a distinction between this case and Turner? Your Honor, that is also related to the nature of the error, the structural error. That is that structural errors require a new trial whenever they occur. For example, if a defense lawyer becomes ill in the middle of a trial, unforeseeably, the trial does not simply go on. This trial must stop and the defendant must be afforded counsel. But if I understand, maybe it's reading between the lines a bit, but if you take the California Supreme Court's conclusion, they're interpreting Turner to say that if it's not foreseeable, it's not structural error. Do you read it that way? Respectfully, Your Honor, no. We don't read the California Supreme Court's opinion. Hypothetically, if we did, I suppose your argument would be the same, that that's part of the error. That's correct, Your Honor. Yes. It's a due process error that you're alleging, right? Yes, Your Honor. And isn't that typically, in this sort of a situation, require some affirmative participation on the part of the State in a fault-based situation? Your Honor, there's no indication in Turner or Gonzales that there has to be a requirement of fault on the part of the State. In fact, there was a specific finding in Turner that the bailiff did not engage in any misconduct whatsoever. That is part of the Turner analysis, this assumption that he didn't impart any improper information to the jury outside of court. Well, I guess it depends on how you define fault because they knew at the outset, for example, that they had a couple deputies that investigated the crime, and they put those deputies in the courtroom to babysit the jury in a sequester. So when I say the State, I'm saying broader than the deputy himself. So the State basically engineered the whole sequence. Here, they had no idea that Mr. Cummings was going to drop this bombshell of a statement within hearing of Mr. Licasella. So are you saying that makes no difference? No, Your Honor. It's simply that even if the error here was unforeseeable or the testimony was unforeseeable, the solution was to empanel a new jury. So I think the answer to my question would be then, yes, it makes no difference, the sequence of what happened here. It just happened, and a mistrial was required. Yes. Yes, Your Honor. And they should have been – and did you make the suggestion that the mistrial should have been asked for by the prosecutor? Not necessarily. In this case, the defense actually asked for the mistrial. And returning to the nature of the claim, the way that we know that it is structural error is to look at the actual language in Turner and Gonzales. And when we do that, we see that Turner focuses on inherent prejudice. It says it would be blinking reality not to recognize the extreme prejudice inherent in the prosecution's – or excuse me, in the association between the jurors and their protector. Gonzales also says the adversarial system is perverted when a member of the court's neutral staff joins the prosecution in securing a conviction. This, Your Honors, is the language of structural error. And, again, when we look at the holding of Turner, it's also based on the right to an impartial jury. Maintaining that ethical wall between the neutral staff of the court and the prosecution, when that breaks down, there is no longer an impartial jury. An impartial jury is one of the pillars of a fair trial. And it is an error in the framework of the trial, not merely an error in the presentation of the evidence. Now, with the court's permission, I would like to address the Batson claim. Now, the Batson claim has not been certified, is that correct? That's correct, Your Honor. So you're asking this court to grant a certificate of appealability with respect to that claim? Yes, Your Honor. In this claim, the prosecutor used peremptory strikes on two prospective black jurors, Passmore and Broussard, for several reasons, including their friendship with a third black prospective juror who had been excused early in the proceeding, Mr. Redman. Now, this claim is also subject to ADPA, and Mr. Cummings has raised a number of arguments under both D1 and D2, but all of them center on the state court's failure to conduct a sensitive inquiry into the direct and circumstantial evidence of the prosecutor's intent at Batson Step 3. Most notably, the state court failed to address the primary issue with this claim, which is that jury selection was tainted from the very beginning through the DA's race-based scrutiny of prospective juror Redman. Now, Mr. Redman was one of only four jurors in the panel that was about 4% black. Despite the fact that Mr. Redman had indicated on his questionnaire that he had no criminal history, the district attorney ran a background check on him anyway. And when the defense asked for an inquiry into how these checks were being run and whether the DA had targeted Mr. Redman, the DA's response was he was running everybody, time permitting, but that it was a relatively low priority. That was the answer that was given in open court. But later, in a closed hearing without defense counsel present, the court asked the DA again, so how did you get to Redman? And his answer at that point was this. He said, I'm going to answer that because it was actually my idea. When Mr. Redman sat down, I looked at him, and I turned to Detective Holder, and I said to him, that man has an arrest record. And Detective Holder agreed with my assessment, and that is why Mr. Redman was run out of order. Your Honor. What happened to Mr. Redman? Pardon me? Redman was seated, but then what happened? He was not seated. But he has to be excused, right, Redman? He did. He was eventually. There's really no Batson error you can claim from Redman not being seated, is there? Your Honor. The juror has to be excused. The court granted the request, so no preemptory was ever made. Under Batson, Your Honor, the court can consider all relevant circumstances of the prosecutor's intent. And here we have the district attorney engaging in racial profiling to subject certain jurors to more scrutiny. And although there is actually nothing wrong with running a background check, it must be done in a race-neutral fashion. When it's not, it's akin to the jury shuffle that was discussed in Millerell. Was Mr. Redman's situation raised as a racial profiling allegation before the California Supreme Court? No, Your Honor. It was in the record. It was contained in the record. I understand it's in the record, but it wasn't raised as an allegation. Then was it raised in the district court? No, Your Honor. So the first time it's raised is in this court, is that right? The particular scrutiny of Mr. Redman was raised for the first time in this court. However, the evidence of that happening is contained in the state court transcript. And to the extent that that information only came out in a closed hearing without defense counsel present to make it part of the Batson hearing, that would constitute a defective fact-finding process under D-2. Was your argument as to Juror Redman that he was improperly removed from the jury, or is it your argument that that indicates, provides evidence of further Batson error with respect to the other two jurors? Yes, Your Honor. I said either or, and you said yes. Excuse me. It does provide circumstantial evidence of discriminatory intent with regard to the jurors who were actually stricken later on. I think you'd have to agree that you don't, if it were Redman alone, you would not have a claim at this point. Pardon me? It wasn't raised below. It wasn't raised in the California Supreme Court. And, in fact, he was not excluded by the prosecutor. That's correct. He was not the subject of a peremptory strike. So I think, Your Honor, that would be correct. However, his treatment and the actions of the district attorney in subjecting Mr. Redman to additional scrutiny is a fact that this Court can consider. When evaluating the strikes of the other two jurors. Well, let's take the Mr. Broussard, was it? Yes. This is the death penalty. He has strong views on the death penalty, and then he has the dirty look situation. Wouldn't the strong views on the death penalty be enough for determination if you wanted to strike him? Perhaps if that was the only reason alone. But here we have several reasons given. And I can go discuss them to show that several other reasons were pretextual. But is there any comparative juror for him? Did he make any comparative analysis? I didn't see any. I'm not sure how he becomes a Batson, someone to analyze within the Batson context. Your Honor, there wasn't another juror that was compared to him. But to the extent that the D.A. thought that Mr. Broussard's views on the death penalty might bias him toward the prosecution, I note that the D.A. didn't move to strike him for cause or during Javier Boidier. He accepted him. And if the D.A. genuinely believed that this particular juror wasn't qualified or had harbored significant bias against the D.A., we would expect to see a strike. That's not a bar. Pardon me? That's not a bar, is it? No, no, no, no. It's not a bar. It's simply a fact that the court can consider. If a D.A. harbors a genuine belief that someone has a death penalty bias, you would expect to see an attempt to strike for cause. But that's a fair amount of speculation. Where did the California Supreme Court go wrong vis-à-vis Broussard? They went wrong by simply accepting the prosecutor's reasons without comparing them to the record or to the facts contained in there. But who did they compare him to, or what did they compare him to? Well, in particular, Your Honor, I'd like to go back to his perceived friendship with Mr. Redmond. Now, the district attorney said among his reasons he struck Broussard and Passmore because of his perceived friendship with Redmond, and he believed that both of those two jurors might have picked up some resentment against the prosecution for the way that Mr. Redmond was treated. But that's because he was supposedly their friend? Yes, Your Honor. That is based on the district attorney having seen three black men talk to each other in the hallway on a half a dozen occasions. There's no evidence in the record, however, that Mr. Redmond told either Mr. Broussard or Mr. Passmore what happened to him. There's no evidence that either of them picked up on any resentment, and we can infer that it's not there because when Mr. Redmond himself was questioned, he said he was not troubled by the inquiry into his background. Also, if he was truly embarrassed, as the DA said, it's very unlikely that he would share those facts with two people he just met during jury service. And so what we really have is just the prosecutor's speculative fear that these two jurors will be biased toward the prosecution. And what that really is is an impermissible belief that black prospective jurors will put their allegiance to members of their own race above their solemn obligation to be fair to both parties and to follow the law. And that kind of speculative fear is exactly the kind of historical prejudice that was used to keep blacks from jury service, especially where the defendant was also black. I'm having some trouble understanding why you can attribute it to being black. I mean, if you see three ladies hanging out together during voir dire and they look like they're becoming buddies and you're worried about, well, how's the effect of one on the other? I'm not sure that says, well, it's a gender because you strike one. This happens to have three black men out there hanging out with each other, which the jury does while the voir dire is going on. I don't see, I guess what I'm having trouble is making the jump to the racial as opposed to people hanging out with each other and that that may have some impact on how they would interact with each other on the jury. Well, Your Honor, it's simply that this inquiry into Redmond's background and then his perceived friendship with these two jurors removed 75 percent of the available black jurors in this panel. And if the DA really suspected that either Passmore or Broussard was somehow resentful on behalf of their friend, he should have questioned them about it. We see no questioning whatsoever. Well, with respect to Broussard, there's additional reason, too, that his brother had been charged with a crime and potentially prosecuted by the same office, correct? That's correct, Your Honor. So with Broussard, you have the race-neutral explanation that he was opposed to death penalty, his brother had been prosecuted, and then you have his acquaintance with Redmond. Are those the three reasons? There's a dirty look. A dirty look, yes. Yes, Your Honor. So leaving aside the friendship with Redmond, the other three are at least facially race-neutral. Your Honor, the brother with the robbery conviction, there we do have a comparative juror analysis. There was also a white juror, Ankeny, who had a brother with a conviction. Right, but he was not opposed to the death penalty. No. But Batson doesn't require for us to find a non-black juror that has every single characteristic. It's often impossible to do that. Right, but what we have to focus on is the California Supreme Court decision and their conclusion that it was acceptable to excuse Broussard, and they relied on those three factors, four factors, not unreasonably, I think. Your Honor, even if the court is not convinced on the strike of Broussard, there's also the strike of Passmore. Right, so Passmore is a stronger case for you. Correct, and relief can be granted on a discriminatory strike of a single juror. With respect to Passmore, there were numerous reasons given by the DA, and none of them stand up to scrutiny when we compare them to the evidence in the record. For example, the DA said he struck him because he or his son was a paramedic and might know either the victim or a paramedic who treated the victim. Now, Passmore was never a paramedic, and the other justifications were added when the prosecutor realized his mistake. But there's no evidence in the record to support Passmore's belief that his son knew who treated the victim or that he had told his father about it or that it had affected him in any way. What about the connection with respect to his hearing from his own employees about this case? Yes, Your Honor. Mr. Passmore had indicated on his questionnaire that he thought the defendants might know him. But then in court, he said, I don't know the defendants. I don't know Mr. Cummings. And there's no, even if you were to accept that he had heard some information, it would not be the kind of information that would make him biased against the prosecution. It was unfavorable information. So that is not a, that's a contextual reason to strike. Another reason given by the DA was Passmore's belief or statement that he didn't believe the case was serious. Now, here we have a failure on the California Supreme Court to analyze this at all. They don't discuss it. In violation of Batson, which requires discussion of all reasons given. May I go back to Mr. Passmore? The reason there was living close to the scene of the crime. That was one of the reasons. That was the main reason. And there was some attempt to compare him to Mr. Dantzler. Correct. Who now, according, as I read the 28-J letter, may well be African American as well? Yes, Your Honor. Okay. So two guys, one gets struck, one doesn't. But also didn't Mr. Dantzler live across the way, I mean, in terms of the proximity to the crime? He did live at a further distance. There was another juror, however, a juror Valdez, who also lived in Lake Terrace. But she never got in the jury box. No. But there was still no questions put to her ever about whether she knew her neighbors or would be affected by her residence. Well, but if she's not in the jury box, I don't see how she wasn't stricken or not stricken. She just faded into the not got selected category. I'm not sure how she would come into the Batson analysis. Even if we don't consider juror Valdez, the questioning of Mr. Passmore himself on this issue. I mean, if we don't have Valdez, because she never got in the jury box, and then we have Mr. Dantzler, who may well be an African American, but he lived way across Lakeview Terrace, do we have any comparative juror? Your Honor, even if Mr. Dantzler is ---- Let's just ask first, and then maybe you can give an explanation. But do we have any comparative juror if those two are taken out of the equation? No. Those were the two most comparative jurors on that, for that particular reason. Counsel, you're down to less than five minutes. If you wish to reserve, you may want to consider that. Otherwise, you control your own time. Yes, Your Honor. I would like to reserve the remainder of my time. You may do so, counsel. We'll hear from the State. Good afternoon. May it please the Court. Lance Winters on behalf of the Warden Respondent. The California Supreme Court's rejection of petitioner's claims in this case were not an unreasonable application of clearly established Supreme Court precedent. The District Court so found, and habeas relief was properly, therefore, denied, and the judgment should be affirmed. As to Deputy LaCassella's testimony, the District Court said Turner and Gonzalez are, quote, The deputy's contacts in this case were minimal, not continuous in any way, as in Turner and Gonzalez. His testimony was not crucial, and it was not foreseeable. The California Supreme Court based its decision on all three of those factors coming together. But, you know, Turner was a, what, a three-day trial? That's correct. And Gonzalez was a one-day trial. I believe so. This is a six-month trial where the deputy or the bailiff had contact on 57 days. It's a lot more in the aggregate contact in this case than in Turner and Gonzalez. I don't think that's accurate, Your Honor. I think the, if you look at the contacts, first of all, Deputy LaCassella was the bailiff in charge only at the initial stage of voir dire. This was a time period when prospective jurors only came into court twice. They came in as part of an initial panel that was qualified for hardship, and then they returned on an individual basis. For a death penalty qualifying voir dire. So he was the bailiff for a period of three months while that occurred, from roughly October to late December or early January. But he would have only had contacts with any single juror twice. By contrast, further on in the trial, when we get to February, when the parties have an actual death penalty and hardship qualified panel, and voir dire is proceeding in open court, Deputy LaCassella is not the bailiff anymore. He's relegated to security at the back of the courtroom. Deputy Ron Burt had assumed the role of bailiff in the court. So he was no longer, he was not escorting the jurors in and out of court. He didn't have conversations with them. He certainly wasn't having meals with them or conversations with them. He expressly testified that he did not socialize with jurors, a finding that the trial court personally and expressly observed and mentioned on the record. And, of course, the Deputy LaCassella had no prior association with any of the jurors. At most, there were a couple of random contacts where the jurors handed notes to him, and he immediately handed them to Deputy Ron Burt. But part of the analysis that underlies Turner is here's a person who is perceived by the court as trustworthy and by associations and has contact with the jurors in a professional capacity. And at least I grant you that the contacts in Turner and Gonzalez are more intimate in terms of social contacts. But there are a lot of contacts with various jurors between this deputy and over this course of a long, long trial. Well, again, the only contact. What I was going to say is, apart from the factual distinctions, which I think you and I know, where do we draw the line? Well, I don't think it's, first of all, I don't think it's contacts alone. I think it's contacts plus the importance of the testimony and the non-foreseeability of the testimony. I think certainly the contacts in this case are about as minimal as could possibly be by someone who is actually in the courtroom. I mean, we're not even talking about the bailiff who's bringing them in and out of court anymore. What about the importance? That's where it seems the California Supreme Court may have gone off the rails a slight bit because they said he wasn't that important of a witness. And in closing argument, the prosecutor says something to the effect of this may well be the most important witness, and you could convict on his testimony alone. I mean, I realize there's other witnesses, but if I'm listening to that, I'd look pretty hard at his testimony if I were on the jury. Well, the prosecutor made similar arguments about Robert Thompson as well, and I think that just shows that there's a lot of arguments made in argument. In fact, at the very end in rebuttal, and this is in the appellant supplemental excerpts at 31, the prosecutor argued you could base his testimony on Deputy Law Cassella's testimony alone, but you don't have to. He said, quote, don't take these things in an isolated way. So I don't think the prosecutor was hinging his whole case on Deputy Law Cassella's testimony. No, but I don't think they have to. He's a key witness by any measure, don't you think? I think he was an important witness, but I don't necessarily think he was key. He was one of six witnesses who testified to confessions by Petitioner in this case. Two others were deputy sheriffs who heard admissions in the county jail. Three others were inmates. He was one of six hearing admissions from Petitioner. And that's not even counting all the pre-offense statements made by Petitioner in this case, indicating that he was willing to shoot a police officer if stopped by an arrest. Right. But I think in fairness, his testimony was the most direct as to the one-gun passing between the two individuals in the car. That may be. And that was the critical issue in the case because we didn't know for sure who shot the police officer. Well, you have to remember here that Petitioner and Codefendant Gay had separate juries. So all this jury had to determine was that Petitioner filed a shot. Some of the jurors might have thought that he fired more than one shot. So it was not critical to this jury, Petitioner's jury, that they believe that he only filed or fired a single shot. Right. But the gun had to be passed back to him. And that's where the bailiff's testimony comes in. I don't know. He didn't say anything about passing the gun, but he said, I put it, put those shots in it. Right. But I don't know what you mean by passed back to him. The theory was that Petitioner fired the first shot and then passed the gun to Codefendant Gay. But then the confessions or the statements are kind of all over the map between six shot. I don't know if that means the sixth shot or I shot six shots and then the fourth shot. There were times when Petitioner took credit for firing all of the shots. That's true. But, again, Petitioner's jury didn't have to worry about that. They only had to worry about whether he fired a single shot. A shot. And it wouldn't matter which number. Because even if it was just a single shot, he was guilty of murder. As a result of Gay. Or because the police officer died. Because, well, if Petitioner fired the single shot, he would have killed the police officer. It was a fatal wound. Right. Yes. Counsel, what happened to Codefendant Gay? I understand that at some point, was it the California Supreme Court or a California court granted a habeas? Gay's case has a long and tortured history. Well, we don't need to go into a lot of detail. Briefly summarize. His case was reversed as to penalty on state habeas in the California Supreme Court. The penalty was retried. And it was reversed on appeal. Were you counsel in those cases, too? Pardon me? Were you counsel in those cases? I was on some of the appellate proceedings, yes. He then filed a state habeas petition attacking guilt. The California Supreme Court has issued an OSC and a reference hearing, I believe, concluded in state court this week or last week. So the current status is? That he is convicted of first degree murder with special circumstance. He is not under a death penalty judgment. Retrial of death penalty proceedings has been stayed pending the outcome of the state habeas. So after the referee issues findings from the hearing that just occurred as to whether he had. So there's no final decision with respect to the penalty? No. Very well. If we were to disagree with California Supreme Court and say not that he's the key witness, but that he's a key witness. That would definitely put us still squarely in Turner, correct? I believe so. But would we then make a de novo review as to whether the contacts were minimal? Or would we still owe deference on the minimal contacts analysis? I think, you know, I think the determination of whether he was a key witness is part of the overall ruling. I think you would have to find that the overall ruling that Deputy Locke's testimony was proper was unreasonable before you get out of D. I don't think finding that one part of their analysis is you disagree with, but other parts you agree with. I think you have to apply D to the whole analysis. And if they were unreasonable in finding that there was no error under Turner and Gonzalez, then you're out of D. Your third issue was foreseeability as to the California Supreme Court decision. Are there any other courts that have adopted a foreseeability standard in this context that you know of? I couldn't find any that have addressed those, that have had those facts. There was one case where, and this is cited in my brief, Williams v. Thurman, where a bailiff heard some statements during trial similar to what happened here, but they didn't base their decision or the upholding of the state court decision in that case on the foreseeability. So explain to me why foreseeability makes a difference. Well, I think the difference is, I mean, the district court called this a glaring difference. The only reason this evidence is created is because of the petitioner's voluntary statement. There's no state action here. There's nothing that the state has done wrong. And, you know, I think it also points to the fact that, you know, we've talked about whether this is a key witness, an important witness. We have to remember, this case was going to trial anyway. It was in trial. The prosecution felt they had enough to convict beyond a reasonable doubt before he made this statement. So that brings up another point when you say we talk about foreseeability. Yes, his testimony arrived on the scene serendipitously, but there was no requirement that he be called as a witness. So, in effect, the state decided to put its imprimatur behind him and call him as a witness. And, you know, it's not as if I'm saying the state created the situation, but it was totally within the state's control to determine what to do with Mr. Casella, wasn't it? That's true, but I don't think there's any fault in the state in using relevant probative evidence when it comes up mid-trial, just as it would if they had discovered an eyewitness in the middle of trial who was relevant. Right, but the eyewitness wouldn't have been a deputy. There's another point I wondered about in the Turner decision. Before they get into the point about those deputies being, you know, too far in bed, if you will, with the jury, they also make the statement something to the effect of it still would have undermined the basic due process rights of the trial to have this kind of an association with the jury, even if they hadn't been deputies. What do we make of that statement? I think what you make of that statement is if you had a jury who was having lunch with the witnesses every day, that would be a big problem, and that's why this case is different. So in other words, the same kind of conduct with or without being deputies would have landed you into a due process issue. Absolutely. So why does foreseeability matter? I mean, if we assume hypothetically that the bailiff has continuous and intimate contact with the jurors and that the bailiff is a key witness, why does foreseeability matter under Turner? Because I think part of what you're holding the, I think part of the constitutional violation is holding the state to foreseeability in knowing that these things are going to be an issue at trial. I think, you know, obviously, you know, and this was mentioned earlier, the state knew in Turner and Gonzales that these were the main witnesses, and yet they thought nothing of the problem with having them talk to jurors at lunchtime. But if in fact the problem with a Turner situation is that you have a trust of the jurors in the bailiff or the person who's had intimate contact, the state may be less culpable because it didn't plan it, but I'm not sure that it matters for due process purposes, does it? I think it's still a significant factor. I, you know, if we had a case that was, where it was conceded, for instance, that there were intimate and continuous association, like Turner and Gonzales, and they were key witnesses, but that was somehow not foreseeable, it might fall within Turner and Gonzales. It's hard to imagine that happening, frankly, that something that important wouldn't come up. I can imagine if you're in the middle of a trial, you have a key witness, you had a confession, you say, should we risk a Turner violation? Well, you know, in thinking about this case, I thought about that. I mean, what if, you know, if, you know, if Deputy LaCassella had taken Cummings' Petitioner back to his cell, and they had engaged in a conversation, and they had spoken for hours about the details of the crime, you know, that might be a very — that would be a very different situation, and it might be just — and it might make Turner and Gonzales distinguishable. But that's obviously not the issue. The issue is whether, on these facts, the California Supreme Court could reasonably conclude that Turner and Gonzales were distinguishable. And I think for all three of those reasons it is. I'd also just like to note that, you know, the trial court also took steps to ameliorate any problems by giving an instruction. Immediately prior to Deputy LaCassella testifying, he acknowledged that Deputy — the court acknowledged that LaCassella had been a bailiff in the court and said that you are to judge all witnesses' testimony on the same basis, and you should not give his testimony automatically any greater weight or credence than any other person who testifies in this court. Trial court — and that's in the supplemental excerpts at 23. The trial court gave a similar instruction in the closing instructions at the close of the guilt phase, saying that the jury was the sole judges of believability and that no one could be presumed more believable because of their employment, including law enforcement. Of course, that's an instruction that's given in virtually every criminal trial where you have an officer testifying, any law enforcement officer. And it's hard to figure out how to square that with the Supreme Court's statement to the effect of the role of the bailiff, if he's the guardian of the jury, is something special. So it's even different than just a law enforcement officer getting on the stand and testifying as to what he saw or observed or how he participated. How do you thread the needle between those two situations? Well, I think the admonishment by the trial court immediately prior to his testimony was definitely aimed at his testimony. I mean, that's what the trial court said. So it was clear that it was not just for general law enforcement. I also think — and this goes back to the context — you know, you don't have a deputy. Deputy Locasella was not charged with keeping control of the jury once the jury was impaneled. He was out before the general voir dire began. You know, and I think in Turner and Gonzales, you had not only people who were escorting them everywhere they went and sort of running errands for them, but became friends with them. I mean, the Supreme Court characterized Turner as the bailiff's having the opportunity to renew acquaintances and make new friends. Or I think it was actually the other way around — renew friendships and make new acquaintances. And do errands for the jury. And do errands for the jury. What about structural error? What's your view on that? If there is a Turner error, is it structural error? I don't believe so. I think that usual Brecht harmless error analysis would apply. And for the same reasons that his testimony was not crucial, it would be harmless in light of all the other evidence. What's your strongest support for saying it's not a structural error? Because that's where you definitely are on opposite sides of Ms. Dahlstrom's view. I think the category of structural errors is very narrow. And that's what the Supreme Court has said. It tends to be things like the absence of counsel at a critical stage. You know, defective reasonable doubt instruction. We're talking about the admission of one piece of evidence in this case. That's really very different, even if it comes from a bailiff. If I may, I'd like to turn with my remaining time. Counsel, should we grant a COA on the Batson issue or not? Of course not. Because, again, the California Supreme Court reasonably applied Batson in rejecting Petitioner's Batson claim. Well, it's a pretty low standard on a certificate of appealability you grant. That's absolutely true, Your Honor. One thing I'd like to point out. So you might as well address the issue. Couldn't get off that easy. You know, I'd just like to reframe the discussion and remind everyone, we're not talking about challenges for cause. These are peremptory challenges. In almost every instance where a prosecutor is using a peremptory challenge against someone because of some negative attribute, the juror has already said, I will be fair notwithstanding that negative attribute. Otherwise, it would have been a challenge for cause. So you've always got conflicting information from these prospective jurors. Yes, I'm against the death penalty. I voted against it. I would vote against it again. Can I be fair and impartial as to the death penalty? Sure. Now, is the prosecutor required to believe that in a peremptory challenge? Of course not. And so in this case, the prosecutor properly decided that Mr. Broussard was an unfavorable juror based on his death penalty views. He was against death penalty. He gave him dirty looks, which made the prosecutor feel that they were not going to relate to one another. This court and the Supreme Court has recognized that body language, facial gestures, hostile facial gestures, is a reasonable and genuine reason for peremptory challenges. He had a brother who had been convicted of a crime in Los Angeles County, a robbery. And the prosecutor was afraid that he might feel resentment against him for being part of the same office that put his brother in prison. And yes, there was also the friendship with prospective juror Redman. But the prosecutor did not racially profile prospective juror Redman. He said he was going to run background checks on all the prospective jurors. He did say he was going to start with juror Redman because he had a feeling, as did Detective Holder, that this man had prior arrests. There's nothing to indicate that he had that feeling because the juror was black. And to assume so is to engage in speculation that's improper. So what about Passmore? I mean, Passmore's a tougher case for you because the explanation doesn't quite hang together. I think Passmore is also a well-justified challenge. Passmore was simply too closely connected to this case. He lived in Lakeview Terrace near where the crime occurred. He said Petitioner might know him because he worked in the schools where Petitioner had resided. And his co-workers knew Petitioner and had told him information about Petitioner's background. Which was negative and pro-prosecution? Pardon me? Which was pro-prosecution? Well, it's unclear. He testified about an incident that involved his mother. And he said it wasn't good, but it's not clear. I mean, we didn't really get much more information than that. But I think the prosecutor was afraid that it would interfere with his – that all of these factors would interfere with his ability to judge the case based solely on the evidence instead of outside information or outside influences. Now, he was pro-death penalty, right? I believe that's correct. He was the prosecutor's juror in the abstract, anyway. Well, as to that one characteristic, yes. But I don't think, you know, any prosecutor looks at – you know, it's not just a binary test of pro-death penalty, anti-death penalty. It's a variety of factors. It's the whole package. Right, but there's – you can easily ask a juror, and most people do, do you know anybody – here's a witness list, do you know anybody? Instead of saying, well, he was near the scene – he lived near the scene, as did some other jurors, albeit farther away. And therefore, he might have had some contact inadvertently. I mean, that's – You know, in reading back through the vaudeville of this juror again, I realized that I made a misstatement in our brief, as the district court did, and initially said that this juror lived 3 1⁄2 blocks from where the crime occurred. In fact, he said he lived 3 1⁄2 blocks from Foothill and Van Nuys. But that's not where the crime occurred. Right. When he was asked where the crime occurred, he said, I live within about 50 yards. He lived on the same block. He's going to see the physical descriptions of these things every day. He's going to be walking down the street where the witnesses live every day. I think it's reasonable to fear that somehow that's going to go bad, that he's going to get information that he's not going to be able to separate or that's going to influence his decision, and the prosecutor reasonably decided that he wanted to control for that. Perhaps. Because I look at it as pretty much all pro-prosecution information. He's worried for the safety of his community. He had heard negative things about the defendant from his coworkers. And the paramedic thing seems a little far-fetched to me. All in all, in fairness, I accept what you're saying, but it reads as far more pretextual a statement than the statements made about Broussard. Well, I disagree, Your Honor. I think it's reasonable to want to have a juror who doesn't know anything about this case, who isn't going to run into contact with anyone. Even if this juror gets excused later during trial, a huge amount of resources and time went into this case, and you don't want to have to try this case again, I think the safest bet is to get this juror off. But again, that wasn't the only reason. Those weren't the only reasons. In addition, Mr. Passmore said during the void year that he was not impressed with the case. And the prosecutor, going from his notes, said that, you know, that troubles me. And Mr. Passmore later agreed when asked if this was a serious matter, and said, yes, it's a serious matter. But again, the prosecutor's not required to believe the latter response and ignore the former. The prosecutor's making credibility determinations here, too. And he could reasonably decide that Mr. Passmore was being more honest when he said he wasn't impressed. And then again, he too was perceived to be friends with prospective juror Redmond. You know, Redmond was placed in a very embarrassing situation. The prosecutor thought that he might feel resentment towards him, and that that resentment might be shared by his friends, Mr. Broussard and Mr. Passmore. And there's no question, you know, the prosecutor said he saw them associating together outside of the hallway. Even defense counsel acknowledged that he had seen them associating together. It's reasonable to infer that they had struck up a friendship. And to be afraid, we're talking about a peremptory challenge here again, not challenges for cause. Yes, and they're all about peremptory. Right, right. But sometimes we forget that, I think, because we talk about whether a reason was good enough. And, you know, I have to tell you, I had a very well-respected trial prosecutor in my office. She won Prosecutor of the Year Award from CDAA. And she said, I talked to her about Gwadir one time, and she said, you know, my family, the rest of my family, they all work for the post office. And they're all crazy. And I would never have a postal worker on my jury. Now, you know, as to her, that was a genuine reason. You know, would I kick people because they were on the post office? No. You know, my family was all teachers, so that's a different story. I think, you know, you have to remember that, you know, they can be based on hunch, superstition. Sure, sure. But, I mean, we have to evaluate it simply on the basis of, does the reason seem pretextual in light of the fact that the jurors who were struck were African-American? I mean, that's the difference. Obviously, there's a wide latitude in peremptories. We all, when we try cases, we have hunches. Right. We look at dirty looks, which may be just, you know, somebody squinting through their contacts and maybe draw wrong conclusions. Absolutely. But, you know, we have to also remember we're a step removed from that because we're on depth at the review. Well, they also compared him to Dantzler. So, Passmore was, at least from the defense point of view, they were trying to make a juror comparison to Dantzler. Right. Would you comment on that? Sure. I mean, now, of course, there's this possibility that Dantzler may be African-American, so we don't have the comparison. Has that been established? Do we know from the record? I don't know. I have to do further research. So, how do you make, what's the burden on a Batson challenge if you don't know the race of the comparative juror? Well, it's petitioner's burdens that prove his claims. So, if he's going to rely on comparative analysis that isn't supported by the record, I think it's petitioner's failure to complete the case. Well, let's say that it wasn't established at, during the trial, at least not in the record, that Dantzler was African-American. What's your response on the juror comparison between Dantzler and Passmore? It's that they're not similarly situated. Dantzler said he didn't live near the crime. He said he lived away, quote-unquote, from where the crime occurred. He lived in east Lake Futerra, as opposed to where the crime occurred, which was west Lake Futerra. He also had not been a member of the community as long as Mr. Passmore. So, the prosecutor could reasonably assume that someone who lived miles away from where the crime occurred is different from someone who lived 50 yards away from where the crime occurred. Getting back to, you know, we talked about evaluating the prosecutor's reasons. And it's the trial court's initial duty to judge the credibility of the prosecutor. And the trial court did that here. And the California Supreme Court specifically rejected a claim that the trial court had refused to engage in a proper analysis. And now, we're on habeas. And as Rice v. Collins says, it's petitioner who has to show that it was unreasonable for the state court to credit the prosecutor's reasons. So, it's not whether this court disagrees with the analysis, but whether it would be unreasonable for the state court to reach those conclusions. And given, I think, all the factors that went into play, not any single reason that was given by the prosecutor for the juror, but when looked as a totality, it's clear that the reasons were race neutral. The trial court evaluated the credibility and found the prosecutor's reasons were genuine. And the California Supreme Court properly rejected the claim to the contrary. Thus, for all the reasons I have stated, the California Supreme Court's rejection of petitioner's claim was not an unreasonable application of clearly established Supreme Court precedent. Therefore, the judgment below, denying habeas, should be affirmed. Thank you. Thank you, counsel. Ms. Dahlstrom, you have reserve time. Your Honors, I have two points on the Turner claim and one on the Batson claim. The first is that the prosecutor's comments in rebuttal, where he said that other witnesses may also be important or the jury didn't have to base it completely on Locasella's testimony alone, I want to emphasize that occurred after the defendant moved from this trial. So the prosecutor now has realized his mistake of going that far. But frankly, that's a bell that cannot be unrung. Once the district attorney has told the jury they can convict on Locasella's testimony alone, he has absolved them of the need to wrestle with the contradictions and all of the other witnesses, of which there were many. And that, again, makes Locasella a key witness within the meaning of Turner. Second, our position is that if this court does find that the California Supreme Court was unreasonable in finding that Locasella was not a key witness, then yes, the court can then go on to analyze the quality of the contacts on de novo review. It doesn't also have to subject that portion of the claim to 2254D scrutiny. Once 2254D has been satisfied under D1 or D2, the entire claim then is reviewed de novo. And third, with respect to Mr. Passmore's comments on where he lived, we disagree with the comments made by a respondent that Mr. Passmore lived within 50 yards of the crime scene. The section that we're discussing is at ER 523, and our reading of that section is that the DA asked, do you know where the crime occurred because it occurred very close to your house? And Passmore said, maybe within 50 yards. So Passmore is saying he knows where the crime occurred more or less within 50 yards, not that he lived 50 yards from the crime scene. And unless there are further questions from the Court, I thank you for your time. No further questions. Thank you, counsel. The case just argued will be submitted for decision. And the Court will adjourn.
judges: O'scannlain, Thomas, McKeown